NO. 06-2333
Criminal

## UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

UNITED STATES OF AMERICA,

**Plaintiff and Appellee,**

vs.

**DARREN YOUNGMAN,**
**a/k/a Tote Youngman,**

**Defendant and Appellant.**

**Appeal from the United States District Court**
**for the District of South Dakota**
**Central Division**

**The Honorable Patrick A. Conmy**
**United States District Court Judge**

**APPELLEE'S BRIEF**

**MARTY J. JACKLEY**
**United States Attorney**
**MARK E. SALTER**
**Assistant United States Attorney**
**P.O. Box 3303**
**Sioux Falls, SD 57101-3303**
**(605)330-4400**

**Attorneys for Appellee.**

## **SUMMARY AND WAIVER OF ORAL ARGUMENT**

Darren Youngman appeals his convictions for assault with a dangerous weapon and aggravated sexual abuse. He alleges the district court [1]abused its discretion by denying his motion for a writ of habeas corpus ad testificandum and by instructing the jury about the use of "on or about" in an indictment. Youngman also claims the district court committed plain error when it commented about one of the Government's witnesses. Finally, he challenged the sufficiency of the evidence for his two aggravated sexual abuse convictions and three of his assault with a dangerous weapon convictions.

The Government opposes each of Youngman's arguments. It also respectfully submits that the facts and legal arguments are adequately presented in the briefs and record and that the decisional process would not be significantly aided by oral argument. Accordingly, the Government does not request oral argument.

---

[1]Honorable Patrick A. Conmy, United States District Court Judge for the District of North Dakota, sitting as a visiting United States District Court Judge.

-i-

# TABLE OF CONTENTS

SUMMARY OF THE CASE AND WAIVER OF ORAL ARGUMENT . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii-v

JURISDICTIONAL STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

ARGUMENT:

I.    THE DISTRICT COURT DID NOT ABUSE ITS
      DISCRETION BY DENYING YOUNGMAN'S MOTION FOR
      WRIT OF HABEAS CORPUS AD TESTIFICANDUM. . . . . . . . . . 18

II.   THE DISTRICT COURT'S COMMENT REGARDING TRICIA
      BORDEAUX DID NOT CONSTITUTE PLAIN ERROR. . . . . . . . . 21

III.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY
      INSTRUCTING THE JURY CONCERNING THE USE OF "ON OR
      ABOUT" LANGUAGE IN THE SUPERSEDING INDICTMENT. . . . 29

IV.   YOUNGMAN'S CONVICTIONS ARE SUPPORTED BY
      SUFFICIENT EVIDENCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

-ii-

Appellate Case: 06-2333    Page: 3    Date Filed: 10/02/2006 Entry ID: 2096957

# TABLE OF AUTHORITIES

**CASES:**

Alidani v. Dooley, 365 F.3d 635 (8th Cir. 2004) . . . . . . . . . . . . . . 1, 24, 25, 27, 29

Coast-to-Coast Stores v. Womack-Bowers, 818 F.2d 1398, 1401
(8th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Johnson v. United States, 520 U.S. 461 (1997) . . . . . . . . . . . . . . . . . . . . . . . 23

LaBarge Water Well Supply Co. v. United States, 325 F.2d 798 24
(8th Cir. 1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Quercia v. United States, 289 U.S. 466 (1933) . . . . . . . . . . . . . . . . . . . . . . 28, 29

Rush v. Smith, 56 F.3d 918 (8th Cir. 1995) (en banc) . . . . . . . . . . . . . . . . 23, 24

United States v. Bustos-Torres, 396 F.3d 935 (8th Cir. 2005) . . . . . . . . . . 2, 21

United States v. Conelly, 451 F.3d 942 (8th Cir. 2006) . . . . . . . . . . . . . . . . . 27

United States v. Dabney, 367 F.3d 1040 (8th Cir. 2004) . . . . . . . . . . . . . . . . 36

United States v. Duke, 940 F.2d 1113 (8th Cir. 1991) . . . . . . . . . . . . . . . . 2, 29

United States v. Eagle, 586 F.2d 1193 (8th Cir. 1978) . . . . . . . . . . . . . . . . 2, 39

United States v. Eagle, 133 F.3d 608 (8th Cir. 1998) . . . . . . . . . . . . . . . . . 2, 33

United States v. Gabe, 237 F.3d 954 (8th Cir. 2001) . . . . . . . . . . . . . . . . . . 2, 33

United States v. Katz, 445 F.3d 1023 (8th Cir. 2006) . . . . . . . . . . . . . . . . . . 29

United States v. LeAmous, 754 F.2d 795 (8th Cir. 1985) . . . . . . . . . . . . . . 1, 18

United States v. LeCompte, 108 F.3d 948 (8th Cir. 1997) . . . . . . . . . . . . . . 37

Appellate Case: 06-2333    Page: 4    Date Filed: 10/02/2006 Entry ID: 2096957

United States v. Olano, 507 U.S. 725 (1993) ....................... 22, 28

United States v. Pirani, 406 F.3d 543 (8th Cir. 2005) (en banc) ......... 2, 22

United States v. Plumman, 409 F.3d 919 (8th Cir. 2005) ............... 28

United States v. Porter, 441 F.2d 1204 (8th Cir. 1971) ................ 23

United States v. Rinchack, 820 F.2d 1557 (11th Cir. 1987) .......... 18-19, 20

United States v. Sheikh, 367 F.3d 756 (8th Cir. 2004) ................ 32

United States v. Singer, 710 F.2d 431 (8th Cir. 1983) (en banc) ........ 23, 25

United States v. Stuckey, 220 F.3d 976 (8th Cir. 2000) ............. 2, 29, 30

United States v. Turner, 189 F.3d 712 (8th Cir. 1999) ............... 2, 30

United States v. Williams, 994 F.2d 1287 (8th Cir. 1993) ............. 22

United States v. Wright, 63 F.3d 1067 (11th Cir. 1995) ........... 1, 18, 19

United States v. Wyman, 724 F.2d 684 (8th Cir. 1984) ............ 1, 18, 19

Weeks v. Angelone, 528 U.S. 225 (2000) .......................... 28

## STATUTES:

18 U.S.C. § 113(a) ............................................. 1

18 U.S.C. § 113(a)(3) ................................... 3, 4, 5, 30, 37

18 U.S.C. § 113(a)(6) ........................................... 3

18 U.S.C. § 1153 ................................... 1, 2, 3, 4, 5, 32

18 U.S.C. § 1201(a)(2) ........................................ 1, 2

-iv-

18 U.S.C. § 2241(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 4, 5, 30, 32, 34

18 U.S.C. § 2241(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

18 U.S.C. § 2246(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 4, 5

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

S.D. Codified Laws § 22-32-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

## OTHER AUTHORITY:

Federal Rule of Criminal Procedure 17(b) . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

Federal Rule of Criminal Procedure 52(b) . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

U.S. Const. Amend. VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Appellate Case: 06-2333    Page: 6    Date Filed: 10/02/2006 Entry ID: 2096957

## JURISDICTIONAL STATEMENT[2]

Darren Youngman appeals a final district court judgment in a criminal case. Youngman is an Indian and was indicted for committing federal offenses within the boundaries of the Rosebud Sioux Indian Reservation in South Dakota. The district court had federal subject matter jurisdiction over the case by virtue of 18 U.S.C. §§ 1153, 1201(a)(2), 2241(a), 2246(2) and 113(a). The district court's judgment was entered on May 10, 2006.[3] CR 118. Youngman filed a timely notice appeal on May 18, 2006. CR 120. This Court has appellate jurisdiction under the provisions of 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

### I.

### WHETHER THE DISTRICT COURT ABUSED ITS DISCRETION WHEN IT DENIED YOUNGMAN'S MOTION FOR A WRIT OF HABEAS CORPUS AD TESTIFICANDUM.

United States v. LeAmous, 754 F.2d 795 (8th Cir. 1985)
United States v. Wyman, 724 F.2d 684 (8th Cir. 1984)
United States v. Wright, 63 F.3d 1067 (11th Cir. 1995)

---

[2] References to the trial transcript will be cited as "TT" followed by the appropriate page number. Docket entries from the clerk's record will be cited as "CR" followed by the specific docket number. The presentence report will be designated as PSR with pinpoint citations to the applicable paragraph. Youngman's brief will be cited as "AB" followed by the appropriate page number.

[3] The district court entered an amended judgment on May 19, 2006, in order to correct clerical errors. CR 119.

-1-

# II.

## WHETHER THE DISTRICT COURT COMMITTED PLAIN ERROR WHEN IT COMMENTED ABOUT ONE OF THE GOVERNMENT'S WITNESSES.

United States v. Bustos-Torres, 396 F.3d 935 (8th Cir. 2005)
United States v. Pirani, 406 F.3d 543 (8th Cir. 2005) (en banc)
Alidani v. Dooley, 365 F.3d 635 (8th Cir. 2004)

# III.

## WHETHER THE DISTRICT COURT ABUSED ITS DISCRETION WHEN IT INSTRUCTED THE JURY CONCERN THE USE OF "ON OR ABOUT" IN THE INDICTMENT.

United States v. Duke, 940 F.2d 1113 (8th Cir. 1991)
United States v. Stuckey, 220 F.3d 976 (8th Cir. 2000)
United States v. Turner, 189 F.3d 712 (8th Cir. 1999)

# IV.

## WHETHER, DRAWING ALL INFERENCES IN SUPPORT OF THE GUILTY VERDICT, A REASONABLE JURY COULD HAVE CONVICTED YOUNGMAN ON COUNTS III, IV, VIII, XV AND XVI.

United States v. Eagle, 586 F.2d 1193 (8th Cir. 1978)
United States v. Gabe, 237 F.3d 954 (8th Cir. 2001)
United States v. Eagle, 133 F.3d 608 (8th Cir. 1998)

## STATEMENT OF THE CASE

On November 17, 2004, a federal grand jury returned a seven-count indictment

against Youngman. CR 1. The charges included one count of kidnaping in violation

of 18 U.S.C. §§ 1153 and 1201(a)(2), two counts of aggravated sexual abuse in

-2-

violation of 18 U.S.C. §§ 1153, 2241(a) and 2246(2), two counts of assault with a dangerous weapon in violation of 18 U.S.C. §§ 1153 and 113(a)(3), one count of assault resulting in serious bodily injury in violation of 18 U.S.C. §§ 1153 and 113(a)(6), and one count of burglary in violation of 18 U.S.C. § 1153 and S.D. Codified Laws § 22-32-1. CR 1. The Government obtained an eighteen-count superseding indictment on May 19, 2005, which added four counts of assault with a dangerous weapon, four counts of assault resulting in serious bodily injury and three counts of aggravated sexual abuse. CR 20.

Youngman entered not guilty pleas to all of the charges and sought a jury trial. CR 7, 24. The trial began on January 30, 2006, and continued through February 3, 2006. Youngman was ultimately convicted of seven counts, including five counts of assault with a dangerous weapon and two counts of aggravated sexual abuse. CR 118.

On May 10, 2006, the district court sentenced Youngman to 280 months of imprisonment, followed by 5 years of supervised release, for each of the aggravated sexual abuse counts. CR 118. For the assault with a dangerous weapon convictions, the district court ordered Youngman to serve 120 months in prison followed by 3 years of supervised release. CR 118. All of the periods of imprisonment are to run concurrently. CR 118.

-3-

## **STATEMENT OF THE FACTS**

A jury convicted Darren "Tote" Youngman of brutalizing three women and raping two of them. At trial, Youngman faced an eighteen-count superseding indictment which charged a variety of sexual offenses and other crimes of violence involving six women. TT 4 (listing alleged victims). He was ultimately convicted of the following seven counts:

Count III:       Sexual abuse of Kathleen King on or about between October 18, 2004, and October 20, 2004, in violation of 18 U.S.C. §§ 1153, 2241(a) and 2246(2).

Count IV:       Assault with a dangerous weapon (a belt) upon Kathleen King on or about between October 18, 2004, and October 20, 2004, in violation of 18 U.S.C. §§ 1153 and 113(a)(3).

Count V:        Assault with a dangerous weapon (shod feet) upon Kathleen King on or about between October 18, 2004, and October 20, 2004, in violation of 18 U.S.C. §§ 1153 and 113(a)(3).

Count VIII:     Assault with a dangerous weapon (a belt) upon Sarah Reynolds on or about between May 1, 2004, and September 30, 2004, in violation of 18 U.S.C. §§ 1153 and 113(a)(3).

Count XV:       Assault with a dangerous weapon (a belt) upon Brenna LaPointe on or about between January 1, 2001, and May 31, 2003, in violation of 18 U.S.C. §§ 1153 and 113(a)(3).

-4-

| Count XVI: | Sexual abuse of Brenna LaPointe on or about between January 1, 2001, and May 31, 2003, in violation of 18 U.S.C. §§ 1153, 2241(a) and 2246(2). |
| --- | --- |
| Count XVII: | Assault with a dangerous weapon (a wooden flute) upon Brenna LaPointe on or about between January 1, 2001, and January 31, 2003, in violation of 18 U.S.C. §§ 1153 and 113(a)(3). |

CR 103 (verdict), CR 112 (post-trial order granting, in part, motion for judgment of acquittal).[4] The seven convictions involve three victims – Kathleen King, Sarah Reynolds, and Brenna LaPointe. All three were, at various times, romantically involved with Youngman. TT 113-114 (King); 331, 334 (Reynolds); 365 (LaPointe). Their individual experiences which led to Youngman's prosecution are described in turn.

## I. Kathleen King – Counts III, IV and V

Kathleen King lived in the Low Rent Housing area of Rosebud, South Dakota, in one unit of a duplex apartment building. At the time of the trial, King had known Youngman for nearly 20 years. TT 111-112. The two had developed a sporadic romantic relationship which spanned the preceding five years. TT 113. Youngman moved in with King in 2003, but he periodically left to stay with his other girlfriends. TT 114.

---

[4] All of these offenses occurred Todd County, South Dakota which lies within the exterior boundaries of the Rosebud Sioux Indian Reservation. TT 415.

-5-

Appellate Case: 06-2333    Page: 11    Date Filed: 10/02/2006 Entry ID: 2096957

King began to have trouble with Youngman in August of 2004. TT 115. He was becoming increasing controlling and jealous, accusing King of having sexual relations with other men. TT 115-116. By October of 2004, Youngman's jealous paranoia was "out of hand," and King began hiding from him. TT 116-117.

What followed was an unnerving series of events during which Youngman stalked King as she moved from place to place in an effort to elude him. TT 117-118. King stayed with friends and family members, but Youngman was never far behind. TT 118. He threatened King at one point, telling her if she "didn't get [her] ass home, it wasn't going to be nice." TT 117. She eventually had her home boarded up by tribal housing authorities because she did not want him there while she was hiding and staying with others. TT 118-119.

King spent the night of Sunday, October 17, 2004, with her friend, Crystal LaPointe, and LaPointe's family. TT 123. The following morning, October 18, 2004, Youngman arrived unannounced and uninvited at LaPointe's house after LaPointe and her boyfriend had left for the day. TT 124. He approached King as she slept on the couch and told her that he "missed" her. TT 124-125. King was frightened and initially wanted to flee. TT 125. However, Youngman was not abusive at that point, and the two had sex. Youngman apologized for his conduct, promised King he would not hurt her and asked her to go back to her home with him. TT 125. King agreed,

-6-

later explaining that she was scared but had no other option and "would have had to go any way [sic]." TT 125.

Once they arrived at King's residence, however, Youngman's disposition turned dark quickly:[5]

> We go inside and he starts saying – he asked who I was fucking; who I had been with. And I told him, nobody. And he tells me to take a shower and wash the cum off my body. So then I take a shower, and when I get out of the shower we go in the bedroom and he tells me to lay down so he can smell me to see if any other man has been there.

TT 128-129.

Over the course of the next two-plus days, Youngman beat King, raped her and continued to accuse her of infidelity. King felt she had no choice but to submit to Youngman's demands for sex and thought it would be futile to resist. TT 131-132. She did, however, try to fight back when he anally raped her in two separate incidents, and she begged him to stop when he penetrated her vagina with his fingers. TT 148-149. She was not successful, and Youngman refused to relent in all three instances. TT 143, 148.

Youngman was also physically abusive. Perhaps fueled by his frequent methamphetamine use, Youngman beat King with his fist, his feet, and a belt. TT 140-142, 149 (describing methamphetamine use); TT 147 (Youngman hit King

---

[5] Youngman removed a board, or boards, from the door in order to gain entrance. TT 126.

-7-

behind her ear so hard her eyes "went black"), 146-147 (Youngman kicked King with his shod foot).

The belt beating was particularly savage. It came following King's emergency room visit for abdominal pain which occurred in the early morning hours of October 20, 2004. TT 152, 177-178. After they returned, Youngman continued his familiar refrain of infidelity accusations which escalated into a violent beating. King described the incident in chilling detail:

> He came in the bedroom and he kept asking me if I was hiding at Larry's house or if I was with Steve. And he kept accusing me of Jay Rock and this kid named Archie, and he kept accusing me of all his friends. And he told me to sit on the couch, so I sit on the couch, and he takes his belt off and he folds it in half and he fits it in his hand real tight and he stands there with it on his shoulder. And he said, "Now, I'm going to ask you who you were with, and every time you tell me no, I'm going to hit you." And then he asked me, and I said "No, I wasn't with him." And so then he grabbed that belt tighter and he hit me. And, that's one, and he did that, he asked me, he hit me three times, and he said "That's three. Now, every time you say, no, I'm going to hit you again." And then I say "No, no, I wasn't with them; I didn't do that." So then he just kept whipping me with his belt and it stung really hard, and I couldn't get away.

TT 142-143.

Throughout the period they were together during October 18-20, 2004, Youngman used ferocious and degrading verbal abuse to further his control over King. He repeatedly told her that she was "nothing but a whore" and "no one loves a whore[.]" TT 135. He also suggested that he arrange to have a number of other

-8-

men "train" her or, in other words, rape her in succession. TT 130. On a trip for spare car parts on Monday, October 18, 2004, Youngman also threatened to stop and torture King in a remote rural location and leave her dead body where no one would find it. TT 136.

King left Youngman at her home on October 20, 2004, and made her way to a nearby tribal office. TT 150. There, she called the police and reported that Youngman was beating her and that she was afraid of him. TT 150-151. The tribal police responded and arrested Youngman.[6] TT 193.

## II. Sarah Reynolds – Count VIII

Youngman and Sarah Reynolds began a romantic relationship in 1994, but Reynolds ended it in 1995 after a physical altercation with Youngman. TT 331. They rekindled their relationship in May of 2004, and Youngman soon moved into Reynolds' apartment in Mission, South Dakota. TT 335. However, after only two months, the relationship again ended because, in Reynolds' words, "things started getting ugly." TT 335.

The date of the breakup was July 31, 2004. TT 336. Reynolds decided to go out that evening and eventually spent the night with a man named Ron Scott. TT 336.

---

[6] King initially did not report the incidents of sexual abuse to tribal law enforcement officials because she was too embarrassed. She did, however, relate these facts when she spoke to Special Agent David Macky of the Federal Bureau of Investigation (FBI) when he spoke to her on November 9, 2004. TT 176, 248.

-9-

She returned at around 6:00 a.m. the following morning. TT 336. When she arrived, she found her babysitter asleep on the couch and discovered Youngman sleeping in her bedroom along with her children. TT 336. Youngman's presence surprised Reynolds, but she was tired and, rather than start a fight, she laid down for a couple of hours of sleep. TT 336-337.

Reynolds awoke to Youngman hitting her in the side. TT 337. He accused her of "go[ing] out on" him and was enraged when he found out that she had, in fact, spent the evening with another man. TT 337-338. Youngman took off his belt and started hitting Reynolds over her legs and feet, striking her about four times. TT 338. Her cries for help did not yield any assistance, but Reynolds' daughter did attempt to intervene by running to her mother and telling Youngman, "Leave my mommy alone." TT 338. Reynolds grabbed her daughter and ran to a corner of the bedroom where they remained for about thirty minutes as Youngman stood brandishing his belt and berating her with vituperative claims she was a whore, deserved to die and was worthless. TT 340. The incident ended after Youngman collected his bag and left. TT 340.

## III. Brenna LaPointe – Counts XV, XVI and XVII

Brenna LaPointe met Youngman in 2000 while she was still in high school. TT 365. The two dated for approximately two months, but their relationship was

-10-

interrupted by Youngman's subsequent incarceration. TT 365; PSR ¶ 88 (Youngman's parole relating to a Nebraska conviction revoked on June 13, 2000). LaPointe and Youngman resumed their relationship, however, in the summer of 2001, and it continued through the beginning of 2004. TT 365.

At trial, LaPointe described an incident in late 2002 or early 2003 in which Youngman began questioning LaPointe about relationships with other men as the two sat down to eat a meal. TT 369. LaPointe denied any infidelity, but Youngman reacted angrily, pushed the table and began chasing LaPointe. TT 369. Once he caught her, he drug her by her hair to the television. TT 369. LaPointe tried to reach a telephone in order to call someone, but Youngman began punching her in the head, nearly causing her to black out. TT 369-370. LaPointe sat on a couch as Youngman continued to yell at her and ask about other men. TT 370.

After picking up a wooden flute, Youngman swung it at LaPointe. TT 370. She raised her left arm in self-defense and prevented the flute from hitting her face, but the blow injured her arm and scratched her eye. TT 370. In fact, Youngman swung the flute so hard that it broke into two pieces after it hit LaPointe's arm. TT 370. She later went to the hospital for medical care after a security patrol noticed her standing by her house, obviously upset. TT 371-372.

-11-

LaPointe also related a separate incident in which Youngman beat her with a belt. TT 373-377. She and Youngman were visiting another person's home when Youngman left for a short time. TT 373-374. After he returned, he began accusing LaPointe of having sexual contact with one of the men who had been present in the home earlier. TT 374. LaPointe's denials sparked more accusations and escalating violence. TT 374-377.

In the ensuing assault, Youngman caused LaPointe to fall into a glass end table and break it. TT 374. He also threatened her with a baseball bat as he tried unsuccessfully to extract an admission of sexual impropriety. TT 375. Eventually, he sat LaPointe down, removed his belt and beat her with it. TT 375-376. She estimated that he hit her "about five" times with the belt. TT 376. The scope of Youngman's accusations grew to include other men as he threatened to use the belt's buckle as part of his beating. TT 376. In the end, he did not use the buckle, however, perhaps because one of the people who lived at the home returned. TT 376-377.

In a third incident, Youngman beat and raped LaPointe while the two were in an abandoned house next to his parents' home. TT 377-378. Although the house was boarded up and not habitable, LaPointe and Youngman surreptitiously gained entrance and planned to stay the night. She described the incident with stark clarity at trial:

-12-

We were retiring for the evening, and we were wrestling around, and I accidentally hit him in the groin area, and I laughed, because it was an accident, and he didn't take it that way. He was very upset and I don't know why it made him turn so fast, but he wanted to get me back for that. He punched me, kicked me and head-butted me and spit on me, and everything. And after he finally stopped, I was uncontrollably crying and I had my knees up, and I was up against the wall and we were on the mattress, and he went back to me and called me in and was trying to comfort me like he was saying, "Come lay down now; it's okay to stop crying." And I was hesitant. I was crying so bad. I didn't want to, but I did not want to upset him anymore, so I went and laid down next to him, and that when we had sexual intercourse, which I was very – something, I did not want to do.

TT 38-379.

## IV. Disposition of other charges

The Government pared six counts from the eighteen-count superseding indictment during the course of the trial. First was the motion to dismiss Counts X-XIV which charged Youngman with one count of assault resulting in serious bodily injury, two counts of assault with a dangerous weapon, and two counts of aggravated sexual abuse. TT 363. In each count, the indictment alleged the victim to be Tricia Bordeaux, another former girlfriend. CR 20.

Bordeaux, however, was reluctant to testify at trial because she feared Youngman. TT 311-312. She did answer some preliminary questions, but her direct examination quickly stalled. TT 311-315. At one point, defense counsel objected to the prosecutor's efforts to obtain additional testimony. TT 314-315. The district

-13-

court indicated it would allow some latitude but acknowledged that "eventually it may be that you can't help people that don't want to be helped." TT 315. Defense counsel did not object to the court's comment, and further efforts to persuade Bordeaux to testify were unsuccessful, prompting the Government to dismiss Counts X-XIV. TT 358-361.

The Government also moved to voluntarily dismiss Count VII which alleged burglary under South Dakota law. TT 625. Prior to closing arguments, the prosecutor indicated that the proof did not appear to support one of the elements necessary for the burglary offense. TT 625.

Of the remaining 12 counts which were submitted to the jury, it voted to acquit Youngman of Counts I, II and IX. CR 103. Count I, in particular, charged Youngman with kidnaping Kathleen King and holding her from October 18-20, 2004. CR 20. Youngman defended the charge with evidence that he left King alone for periods of time over the course of the two days they were together at her apartment. TT 189-190 (King left alone in hospital emergency room); 198-200 (King alone while Youngman left to appear in Nebraska state court).

On appeal, Youngman claims, for the first time, that the testimony of Bonita Pacheco and Francis Means was also necessary to support his claim that King was not held against her will. AB 15-17. Youngman did seek the production of Pacheco and

-14-

Means, both of whom he claimed were in custody, by means of a motion for writ of habeas corpus ad testificandum. CR 79. The motion was filed on January 26, 2006, three days before the trial was scheduled to begin, but it did not include any proffer or information concerning Youngman's asserted need for the witnesses. CR 79. Defense counsel simply indicated that the identities of Pacheco and Means had been only recently revealed to him. CR 79. The district court denied the motion on January 27, 2006, noting, among other things, that it was unlikely the witnesses could be delivered in time for trial testimony in any event. CR 80.

The district court reserved its ruling on Youngman's motion for judgment of acquittal made at the close of the evidence, and the parties submitted post-trial written arguments on the motion. TT 628-629. The court granted Youngman's motion in part and directed a judgment of acquittal for Counts VI and XVIII, citing a failure of the proof to establish the element of serious bodily injury. CR 112. The remainder of Youngman's motion was denied. CR 112.

Additional facts will be added as necessary.

## **SUMMARY OF THE ARGUMENT**

The district court did not abuse its discretion by denying Youngman's motion for a writ of habeas corpus ad testificandum. Youngman made no effort to sustain his burden to demonstrate a need for the testimony of Bonita Pacheco and Francis Means.

-15-

He did not proffer the witnesses' anticipated testimony and did not explain why it was necessary. His efforts to do so for the first time on appeal lack the benefit of a proper trial record and, in any event, are not persuasive. The testimony of Pacheco and Means appears as though it would have related principally to the Youngman's kidnaping charge – a charge which resulted in an acquittal. Youngman's motion was also untimely and unaccompanied by any showing of good cause for the belated discovery of the witnesses he now claims were critical to his case.

In addition, the district court's comment concerning Tricia Bordeaux did not constitute plain error. The isolated comment came as the court ruled on a defense objection. It was offered to explain the ruling and Bordeaux's obvious reluctance to testify. There is no evidence that the court improperly injected itself into the trial or that its impartiality was, at any point, forsaken. Moreover, Youngman is hard pressed to demonstrate his substantial rights were affected since the Government was ultimately forced to dismiss the five counts which related to Bordeaux. Also, the comment appears to have had no effect upon the integrity of the trial. The jury was properly instructed on the law and returned a verdict which included not guilty findings on three counts.

Next, the district court's instruction explaining the use of "on or about" in an indictment was not an abuse of discretion. In fact, it was a correct statement of the

-16-

law. Youngman's claim that the Government was obligated to prove the dates of Youngman's offenses with pinpoint precision is as unsupportable as it is unexplained. Indeed, Youngman never alleged he did not have adequate notice of the dates of the charges, never challenged the sufficiency of the indictment, and never claimed that a variance existed between the charges and the evidence.

Finally, there is sufficient evidence to support Youngman's convictions on Counts III, IV, VIII, XV and XVI. Counts III and XIV charged aggravated sexual abuse against Kathleen King and Brenna LaPointe, respectively. Both women described being raped by Youngman after they were beaten and literally frightened into submission. Counts IV, VIII and XV related to Youngman's use of his belt to beat King, Reynolds, and LaPointe. Each victim described their beatings, and the jury was free to believe their testimony. Youngman's specific argument that he is exonerated by the lack of serious bodily injury to Reynolds and LaPointe is foreclosed by this Court's precedent.

-17-

## ARGUMENT

### I.

## THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY DENYING YOUNGMAN'S MOTION FOR WRIT OF HABEAS CORPUS AD TESTIFICANDUM.

A.   Standard of review.

A district court's decision to deny a defendant's motion for a writ of habeas corpus ad testificandum is reviewed for an abuse of discretion. United States v. LeAmous, 754 F.2d 795, 798 (8th Cir. 1985). "[A] reviewing court should not reverse 'unless the exceptional circumstances of the case indicate that the defendant's right to a complete, adequate and fair trial is jeopardized.'" Id. (quoting United States v. Wyman, 724 F.2d 684, 686 (8th Cir. 1984)).

B.   Youngman failed to demonstrate a need for the testimony of Francis Means and Bonita Pacheco.

Rule 17(b) of the Rules of the Federal Criminal Procedure provides an indigent defendant with the ability to obtain compulsory process for witnesses who are necessary for an adequate defense. Fed. R. Crim. P. 17(b); see also U.S. Const. Amend. VI (providing for an accused's right to compulsory process). Where a witness is in custody, "[t]he proper method for securing a prisoner's presence at trial is a petition for a writ of habeas corpus ad testificandum." United States v. Wright, 63 F.3d 1067, 1070 (11th Cir. 1995) (quoting United States v. Rinchack, 820 F.2d

-18-

1557, 1567 (11th Cir. 1987)). Although technically different, courts generally "have required defendants in criminal cases requesting petitions for writs of habeas corpus ad testificandum to comply with the requirements of Rule 17(b)." Rinchack, 820 F.2d at 1567.

However, "[c]ompulsory process under Rule 17(b) is not an absolute right but like many other trial decisions, is a matter committed to the sound discretion of the trial court." Wright, 63 F.3d at 1070 (citations omitted). In this regard, "[t]he burden of demonstrating the need for Rule 17(b) witnesses is on the party seeking their production." Id. (citing Wyman, 724 F.2d at 686). "Mere allegations of materiality and necessity are not sufficient to establish that a witness is necessary to an adequate defense." Id.

Here, Youngman's motion for a writ of habeas corpus ad testificandum is facially inadequate. It does not contain specific information about the anticipated testimony of Francis Means or Bonita Pacheco. In fact, the record does not appear to contain any indication that Youngman made a proffer – sufficient or otherwise –regarding the substance of the testimony he hoped to elicit from Means and Pacheco and why it was important to the defense. Indeed, the motion lacked even a conclusory statement that the witnesses were important, much less the requisite

-19-

level of detail essential to sustain Youngman's burden that the testimony was necessary to an adequate defense.

On appeal, Youngman attempts to augment the paucity of his record with references to Means and Pacheco which were made at trial along with a belated appellate proffer of their testimony. Of course, these reasons were never presented to the district court and cannot be raised at this late date.

In addition, Youngman never renewed his motion for issuance of the writ during the trial and never sought a continuance based upon the need for more time to obtain the presence of Means and Pacheco. Similarly, he did not offer a reason for failing to discover Pacheco and Means' evidentiary significance earlier, and his motion for the writ could be denied on the basis of its untimeliness alone. See Rinchack, 820 F.2d at 1568 (district court may deny motion for writ of habeas corpus ad testificandum solely on grounds it is untimely as long as defendant had adequate notice of trial date).

Regardless, Youngman's appellate claim that Means and Pacheco were necessary to his defense is unsustainable even if it had been made well in advance of trial. In his brief, Youngman claims that Means and Pacheco would have provided evidence that he was not holding King against her will between October 18-20, 2004.

-20-

AB 13-14. However, that type of testimony would relate only to Charge II of the indictment which alleged kidnaping, a count on which the jury acquitted Youngman.[7]

Furthermore, the Government did not allege that Youngman never left King alone between October 18-20, 2004. Youngman's claim to the contrary stands in stark contrast to the Government's case. In fact, during closing argument, the prosecutor candidly admitted that "[w]e've never disputed the fact that during the course of that two days, she may have had opportunities to leave." TT 636.

## II.

## THE DISTRICT COURT'S COMMENT REGARDING TRICIA BORDEAUX DID NOT CONSTITUTE PLAIN ERROR.

A.   Standard of review.

Where a criminal defendant fails to make a timely objection to a trial judge's comments during trial, this Court "review[s] the comment for plain error only." United States v. Bustos-Torres, 396 F.3d 935, 947 (8th Cir. 2005) (citations omitted).

B.   Youngman did not preserve an objection to the comment made by the district court regarding Tricia Bordeaux.

"An error by the trial court, even one affecting a constitutional right, is forfeited – that is, not preserved for appeal – 'by the failure to make timely assertion

---

[7] Youngman claims the testimony would relate to Counts III, IV, and V. AB 15. However, it does not appear that either Pacheco or Means was with Youngman and King during the sexual abuse and assaults alleged in Counts III, IV and V.

-21-

of the right.'" United States v. Pirani, 406 F.3d 543, 549 (8th Cir. 2005) (en banc) (quoting United States v. Olano, 507 U.S. 725, 731 (1993)). "To preserve an error for appellate review, an objection must be timely and must 'clearly state[e] the grounds for objection.'" Id. (quoting United States v. Williams, 994 F.2d 1287, 1294 (8th Cir. 1993)).

On appeal, Youngman claims for the first time that the district court made an improper comment concerning the willingness of Tricia Bordeaux to testify in the Government's case in chief. However, he never objected to the comment or cited the comment as a basis for seeking a curative instruction or a mistrial. Accordingly, there can be no claim that he preserved the issue.

C.    The district court's comment cannot satisfy the plain error test.

"Errors not properly preserved are reviewed only for plain error under Rule 52(b) of the Federal Rules of Criminal Procedure, as construed in Olano and its progeny." Pirani, 406 F.3d at 549. This Court set out the familiar Olano procedure for plain error review in Pirani:

> [B]efore an appellate court can correct an error not raised at trial, there must be (1) error, (2) that is plain, and (3) that affects substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.

-22-

Id. at 550 (quoting Johnson v. United States, 520 U.S. 461, 466-467 (1997)). "The defendant has the burden of proving plain error[,]" and "[a]ppellate review under the plain-error doctrine, of course, is circumscribed" with the Court exercising "its power under Rule 52(b) sparingly." Id. (citations omitted). In this case, the district court did not commit error, much less plain error.

Trial judges, admittedly, exercise considerable influence over juries and must act to maintain the appearance of impartiality:

A trial judge must be especially cautious and circumspect in language and conduct during a jury trial. The judge must be fair to all parties and not do or say anything that might prejudice either litigant in the eyes of the jury.

Rush v. Smith, 56 F.3d 918, 921 (8th Cir. 1995) (en banc) (quoting Coast-to-Coast Stores v. Womack-Bowers, 818 F.2d 1398, 1401 (8th Cir. 1987)). However, "[a] few improper comments are not necessarily enough to require reversal." United States v. Singer, 710 F.2d 431, 436 (8th Cir. 1983) (en banc) (citing United States v. Porter, 441 F.2d 1204, 1241-1215 (8th Cir. 1971)). The rule governing allegedly improper judicial comments is further tempered by the following:

[W]hen faced with an allegation of judicial misconduct, "[a]n appellate court should be slow to reverse a case for the alleged misconduct of the trial court, unless it appears that the conduct complained of was intended or calculated to disparage [a party] in the eyes of the jury and to prevent the jury from exercising an impartial judgment upon the merits."

-23-

Rush, 56 F.3d at 922 (quoting LaBarge Water Well Supply Co. v. United States, 325 F.2d 798, 802 (8th Cir. 1963)).

The analysis begins with the context of the district court's comments. See Alidani v. Dooley, 365 F.3d 635, 641 (8th Cir. 2004) (context of trial judge's comments "must be carefully considered"). Here, Bordeaux initially took the witness stand in front of the jury and acknowledged her reluctance to testify against Youngman. She indicated she had previously had a romantic relationship with Youngman, and she feared him. TT 312-313. The fact that Youngman's father was her boss also contributed to her reluctance to testify in support of the allegations he had beaten and raped her. As Bordeaux's willingness to continue her direct examination began to wane, the following exchanges occurred:

Q:    [by the prosecutor] Do you recall, were you a passenger in the car and [Youngman] was the driver:

A:    [Bordeaux] Yes.

Q:    Did he become angry about something that had happened to his girlfriend, Kathleen King?

A:    Yes.

Q:    And as a result of that, what did he do to you? I know this is difficult for you Tricia, and I apologize for making you have to go through it again and relive it, but you have to.

        [by defense counsel]    Objection to the commentary being made by this attorney.

-24-

[by the court]                    It's a difficult witness, and I'll give him
                                  some latitude. But eventually it may be
                                  that you can't help people that don't
                                  want to be helped.

TT 314-315. Shortly after this exchange, Bordeaux was excused to use the restroom.
TT 315. She did not provide any additional testimony in front of the jury. See
TT 358-363 (sidebar conference following Bordeaux's earlier departure from the
courtroom).

In context, the district court's comments followed its ruling upon an objection
by defense counsel, and the district court did not, in any way, "so far inject itself into
the trial as to give the jury the impression that it favored the prosecution[.]" See
Alidani, 365 F.3d at 640 (describing the improper conduct of the trial judge in
Singer). In truth, victims of crime often do seek help and what they believe to be
justice. The district court's comment did nothing more than reference that
unremarkable reality.

Furthermore, the idea that Tricia Bordeaux appeared to be one of Youngman's
victims was hardly a state secret. The district court described her as one of the
"alleged victims" at the outset of jury selection. TT 4. Also, before she refused to
continue with her direct examination, Bordeaux acknowledged that she was unwilling
to testify because she feared Youngman. TT 312.

-25-

Moreover, the district court's comments upon Bordeaux's ultimate refusal to

testify were eminently fair and impartial. After the Government moved to dismiss the

counts of the indictment relating to Bordeaux, the district court advised the jury as

follows:

> They will be dismissed. Members of the jury, if you want, just strike
> through those numbers on your index to the charges. And I'm simply
> going to tell you to put them out of your mind and they are no longer a
> part of the case and as far as we are concerned now with our testimony
> and your consideration, it's as if they never were a part of the case.
>
> Let me just say to you, we explored options of what to do with a young
> woman who was just distraught for whatever reason, and determined
> that this is the best option.

TT 363-364. The district court's instruction was discreet and made no mention of the

reason for Bordeaux's distress.

In addition, excerpts from the district court's other instructions advised the jury

of the judge's impartial role:

> ... Please do not assume that I hold any opinion on matters to which my
> questions may have related. ...

CR 94 (preliminary instruction P-3).

> You should not take anything I may say or do during the trial as
> indicating what I think of the evidence or what I think your verdict
> should be...

CR 94 (preliminary instruction P-1).

-26-

> Nothing I have said or done is intended to suggest what I think of the evidence or what I think your verdict should be – that is entirely for you to decide. Remember, statements, arguments, questions, and comments by lawyers, or myself are not evidence. . . .

CR 98 (final instruction F-22). See also Alidani, 365 F.3d at 638-639 (noting similar instructions).

Even if the comment could be characterized as error, it was certainly not clear. There appears to be no authoritative statute or binding appellate decision which definitively marks the district court's comments as unfair and improper. See United States v. Conelly, 451 F.3d 942, 944-945 (8th Cir. 2006) (error must be clear under current law).

Above all, there can be no showing that the district court's comment affected Youngman's substantial rights. Because Bordeaux was effectively frightened into silence, she was not able to provide detailed testimony to support Counts X-XIV – some of the most serious charges alleged. As a result, the Government was forced to dismiss these counts. How exactly Youngman's rights were prejudiced under these circumstances is unclear.

What is clear is the fact that the district court instructed the jury to treat Counts X-XIV as if they had never been a part of the case. The court also instructed that "[e]ach alleged offense, and the evidence pertaining to it, must be considered separately" and that the jury was obligated to "base [its] verdict on each count solely

-27-

on the evidence presented relevant to that count." CR 98 (final instruction F-3). Accordingly, any lingering hint that the district court's isolated comment about Bordeaux impacted Youngman's substantial rights was effectively neutralized by the district court's instructions. See Weeks v. Angelone, 528 U.S. 225, 234 (2000) (juries are presumed to follow the court's instructions).

Finally, even if this Court determines the first three predicate factors of the Olano test were satisfied, there can be no credible showing that the district court's comments seriously affected the fairness, integrity, or public reputation of judicial proceedings. The counts of the indictment relating to Bordeaux were excised and not considered by the jury. Of the remaining counts, the jury voted to convict Youngman on nine counts and acquitted him on three counts. The result is consistent with a fair proceeding and reflects the work of a conscientious jury carefully discharging its sworn duty to consider the facts and apply the law set out in their instructions. See United States v. Plumman, 409 F.3d 919, 930 (8th Cir. 2005) (jury's acquittal of one count in a multi-count indictment "further convinces us the jury carefully weighed all of the evidence, and took seriously its duty" to not convict for counts not proven beyond a reasonable doubt).[8]

---

[8] Youngman's reliance upon Singer and Quercia v. United States, 289 U.S. 466 (1933), is misplaced. Neither case involved plain error review, and both represent rare instances of egregious conduct by trial judges who had abandoned their role of (continued...)

-28-

## III.

## THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY INSTRUCTING THE JURY CONCERNING THE USE OF "ON OR ABOUT" LANGUAGE IN THE SUPERSEDING INDICTMENT.

A.    Standard of review.

This Court "review[s] the district court's jury instructions for abuse of discretion . . . and will affirm if the instructions, taken as a whole, fairly and adequately submitted the issues to the jury." United States v. Katz, 445 F.3d 1023, 1030 (8th Cir. 2006).

B.    The Government may sustain a conviction for a charge which alleges the commission of an offense "on or about between" certain dates.

"The law is clear that the use of 'on or about' in an indictment relieves the government of proving that the crime charged occurred on a specific date, so long as it occurred within a reasonable time of the date specified." United States v. Duke, 940 F.2d 1113, 1120 (8th Cir. 1991) (internal citation omitted). "Time is not a material element of a criminal offense unless made so by the statute creating the offense." United States v. Stuckey, 220 F.3d 976, 982 (8th Cir. 2000) (citation omitted). The statutes defining the offenses of assault with a dangerous weapon and

---

[8](...continued)
impartiality. See Alidani, 365 F.3d at 640 (distinguishing Quercia and Singer).

-29-

aggravated sexual abuse do not include time as a material element. See 18 U.S.C.

§§ 113(a)(3), 2241(a).

Indeed, the significance of the date alleged in the indictment is further qualified

by the following well-established doctrine:

> When the date of the offense is not an element of the charge, we have held on many occasions that a variance between the indictment date and the proof at trial is not fatal so long as the acts charged were committed within the statute of limitations period and prior to the return date of the indictment.

Stuckey, 220 F.3d at 982.

Here, the district court correctly instructed the jury concerning the use of the

"on or about" language in the superseding indictment:

> The Indictment charges that the offenses were committed "on or about" certain dates. The proof need not establish with certainty the exact date of the alleged offense. It is sufficient if the evidence in the case established beyond a reasonable doubt that the offense was committed on a date reasonably near the alleged date.

CR 94 (preliminary instruction P-2).

The district court recognized that the law allowing the use of the "on or about"

language is well settled. TT 619. In fact, the instruction is nearly identical to the "on

or about" instruction approved by this Court in United States v. Turner, 189 F.3d 712,

722 (8th Cir. 1999). In Turner, as here, the defendant provided no authority for the

-30-

contention that the use of the district court's instruction was improper. See id. (collecting cases and secondary authority).

Nevertheless, Youngman clings to his claim that the district court should have given his proposed instruction and required the Government to prove the precise date on which he committed particular offenses. In some ways, the argument seems more like an eleventh-hour attack on the sufficiency of the indictment itself. However, Youngman did not challenge the indictment, either with a motion to dismiss or by seeking a bill of particulars.

In fact, even on appeal, Youngman does not allege he was deprived of notice of the charges he faced, nor does he claim that he was unable to present an alibi defense or that the dates alleged varied from the evidence.[9] Instead, he simply thinks the time periods alleged in the superseding indictment were longer than they needed to be. That claim, though, falls short of demonstrating that the district court abused its discretion by instructing the jury about the use of "on or about" in an indictment.

---

[9] Youngman did not propose an alibi instruction. See Eighth Circuit Model Criminal Instruction 9.07 (alibi instruction). Moreover, it does not appear he ever claimed to have had an alibi with respect to any of the allegations contained in the superseding indictment.

-31-

## IV.

## YOUNGMAN'S CONVICTIONS ARE SUPPORTED BY SUFFICIENT EVIDENCE.

A.  Standard of review.

The standard of review for a challenge to the sufficiency of the evidence is well

established and formidable for defendants seeking reversal of their convictions:

> We review the sufficiency of the evidence de novo, viewing evidence in
> the light most favorable to the government, resolving conflicts in the
> government's favor, and accepting all reasonable inferences that support
> the verdict. We recognize this standard of review is strict and permits us
> to reverse a verdict only if no reasonable jury interpreting the evidence
> could find the defendant guilty beyond a reasonable doubt.

United States v. Sheikh, 367 F.3d 756, 763 (8th Cir. 2004) (citation and internal

quotation omitted).

B.  There was sufficient evidence to convict Youngman of Count XVI –
    aggravated sexual abuse of Brenna LaPointe.

The essential elements of aggravated sexual abuse in violation of 18 U.S.C.

§§ 2241(a) and 1153 are as follows:

1)  The defendant did knowingly cause and attempt to cause another
    to engage in a sexual act;

2)  The defendant did so by the use of force or the threat of force;

3)  The defendant is an Indian; and

4)  The offense occurred in Indian Country.

-32-

CR 98 (final instruction F-13); see also United States v. Eagle, 133 F.3d 608, 610 (8th Cir. 1998) (listing the essential elements of aggravated sexual abuse).

Youngman's challenge to his conviction for Count XVI is narrow, disputing only the force element. He claims that Brenna LaPointe consented to sex, as a matter of law, because she did not specifically tell him "no" before he had sex with her. See AB 23-25. The argument is contrary to the controlling decisional law.

The force element of aggravated sexual abuse "is established 'if the defendant overcomes, restrains, or injures the victim or if the defendant uses a threat of harm sufficient to coerce or compel submission.'" United States v. Gabe, 237 F.3d 954, 961 (8th Cir. 2001) (quoting United States v. Eagle, 133 F.3d at 610. Indeed, neither 18 U.S.C. § 2241(a)(1) nor this Court's decisions exonerate a defendant simply because a victim does not utter the word "no" as she is being raped. In the end, the question of force is properly determined by the jury drawing upon the evidence presented at trial.

Here, there was ample evidence from which the jury could conclude Youngman's guilt on Count XVI. The testimony of Brenna LaPointe effectively ends the inquiry.

Youngman and LaPointe had made their way into an abandoned house next to his parent's home, and LaPointe accidently hit Youngman in the groin as the two

-33-

prepared to retire for the evening. Youngman flew into a rage and began beating LaPointe. He punched her, kicked her, head-butted, her and spit upon her. After literally beating LaPointe into submission, Youngman had sex with her although it was something "[she] did not want to do." TT 379. When LaPointe was asked why she did not say "no" to Youngman, she answered, "Because I was afraid of more abuse." TT 381. Quite simply, the jury was free to accept LaPointe's testimony and reject Youngman's claim that the sex was consensual.[10]

Youngman's argument is premised upon an untenable position – a rape victim must always say "no" to a sexual act in order to sustain a conviction under 18 U.S.C. § 2241(a). He cites no authority for the position, and, at best, his argument merely emphasizes a credibility issue which the jury appears to have resolved against him.

C.    There was sufficient evidence to convict Youngman of Count III – aggravated sexual abuse of Kathleen King.

Count III charged Youngman with aggravated sexual abuse of Kathleen King. He challenges his conviction for Count III, again claiming his sexual encounters with

---

[10] The essence of the Government's position in this regard was summarized in its closing argument:

> You can't beat a woman black and blue; you can't kick her; you can't threaten her; and you can't beat her until she bruises, call her names, degrade her and then say, come here, I want to have sex with you. And because she doesn't say the word "no," think that that's consent.

TT 638; see also TT 657-658 (specifically relating to LaPointe).

-34-

Appellate Case: 06-2333   Page: 40   Date Filed: 10/02/2006   Entry ID: 2096957

King were consensual. The jury's contrary determination, however, is based upon sufficient, competent evidence.

During October 18-20, 2004, Youngman beat, raped, and sexually abused King without her consent. Specifically supporting the charge is King's testimony that Youngman forcibly engaged in anal sex with her two times and also inserted his fingers in her vagina. TT 133-134, 148. All three sexual acts were extremely painful, and King specifically pleaded with Youngman to stop, but to no avail. TT 133-134, 148.

Any claim that King tacitly consented to the sexual acts when they began is simply not consistent with her testimony:

Q: [by the prosecutor] At any time when you got to your place in Low Rent Housing Number 18 when you were with the Defendant, did you want to have sex with him?

A: [King] No, I didn't.

Q: Why did you have sex with him then?

A: Because I was scared of him, and I was scared for my life. You should have seen his eyes, the way he was, high on glass,[11] and mean; no way out, no where to go; no one to hide with.

TT 221 (footnote added).

---

[11] King used the term "glass" synonymously with methamphetamine. TT 140, 149.

-35-

Appellate Case: 06-2333    Page: 41    Date Filed: 10/02/2006 Entry ID: 2096957

This passage perhaps represents the most accurate summary of King's testimony regarding the issue of consent. During the exchange, King is emphatic and unequivocal – she acceded to Youngman's demands for sex because she feared him. In addition, this particular testimony does not contain the word "consensual," the use of which appears to have caused King some confusion. See TT 186 (court defining the term "consensual" after King acknowledged uncertainly about its meaning).

Youngman claims King agreed to the anal sex initially and simply protested too late. However, he lacks legal support for his contention which, frankly, appears to do him more harm than good. Indeed, the unflattering premise of the argument is that Youngman did, at some point, engage in sexual acts with King after she expressly told him to stop.

In any event, Youngman did not request a consent instruction or claim that he made a reasonable mistake of fact regarding King's consent. Furthermore, he offers no argument regarding the incident in which Youngman penetrated King with his fingers. This incident constitutes a forcible sex act and would, by itself, be sufficient to sustain the conviction for Count III.

Distilled to its essence, Youngman's claim is little more than a challenge to King's credibility – a topic which is ill suited for appellate review. See United States v. Dabney, 367 F.3d 1040, 1043 (8th Cir. 2004) ("It is axiomatic that we do not

Appellate Case: 06-2333    Page: 42    Date Filed: 10/02/2006    Entry ID: 2096957

review questions involving the credibility of witnesses, but leave credibility questions to the jury."). The jury's decision to convict Youngman of the aggravated sexual abuse alleged in Count III was correct and should be affirmed.

D.    <u>There was sufficient evidence to convict Youngman of Counts IV, VIII and XV – each alleging assault with dangerous weapon.</u>

To sustain a conviction for assault with a dangerous weapon in this case, the Government was obligated to prove the following elements:

1)    The defendant assaulted the victim;

2)    The defendant used a dangerous weapon (a belt);

3)    The defendant acted with the intent to do bodily harm;

4)    The defendant acted without just cause or excuse;

5)    The defendant is an Indian; and

6)    The offense occurred in Indian Country.

CR 98 (final instruction F-7); see United States v. LeCompte, 108 F.3d 948, 952 (8th Cir. 1997) (citing 18 U.S.C. § 113(a)(3)).

Youngman challenges each of his convictions for beating his victims with his belt. Each count, however, is supported by more than sufficient evidence.

In support of Count IV, King testified that Youngman beat her mercilessly with his belt. TT 142-143. Her testimony was supported by photographs taken on

-37-

October 22, 2004, which indicate severe bruising in the areas of King's back, hips and flank area where Youngman beat her. Ex's 8-12.

Youngman claims King's testimony did not clearly indicate the time of her assault – whether it occurred before or after her early morning visit to the emergency room on October 20, 2004. Strictly speaking, the argument has little to do with the elements of the charge, none of which require that the assault take place before or after the hospital visit. Furthermore, King did, in fact, indicate that the beating took place after her October 20, 2004, visit to the hospital although she could not recall the specific day of the week. TT 177-178 (belt beating occurred after October 20 visit to emergency room), 196 (difficulty remembering the day of the week when the belt assault occurred).

Youngman's challenge to King's credibility on appeal is a fruitless endeavor. Credibility is generally not reviewable on appeal and, regardless, the photographs detailing the extent of King's injuries constitute objective, unassailable support for Count IV.

Count VIII related to Youngman's assault upon Sarah Reynolds. Reynolds told the jury about how she had broken off her relationship with Youngman on July 31, 2004, only to find him still in her home when she returned in the early morning of August 1, 2004. Despite their breakup, Youngman accused Reynolds of infidelity

-38-

and hit her with his belt "[a]bout four" times over her feet and legs. The beating stopped when Reynolds young daughter intervened.

Youngman pins his bid for reversal of Count VIII on the claim that Reynolds was not hurt badly and did not report the incident to a doctor or to the police. AB 28. However, the argument is not sustainable because assault with a dangerous weapon does not require that harm "actually resulted." United States v. Eagle, 586 F.2d 1193, 1196 (8th Cir. 1978).

Brenna LaPointe described a similar incident in which a jealous and paranoid Youngman hit her with a belt while he interrogated her about other men. TT 375-376. He hit her "[a]bout five" times on her legs and quit after another person arrived. TT 376-377. Youngman's repeated claim that Count XV is infirm because LaPointe did not describe a serious bodily injury is also foreclosed by the Eagle decision.

If anything, Youngman's challenge to Counts IV, VIII and XV, perhaps unwittingly, underscores remarkable similarities among them. In each instance, Youngman accused the victim of sexual relations with other men and used a belt as his weapon of choice in a vain effort to extract admissions of infidelity. To be sure, the jury acted reasonably in determining his guilt.

-39-

## CONCLUSION

Based upon the foregoing, the Government respectfully requests that this Court

affirm Youngman's convictions in all respects.

Respectfully submitted this 29th day of September, 2006.

MARTY J. JACKLEY
United States Attorney

MARK E. SALTER
Assistant United States Attorney
P.O. Box 3303
Sioux Falls, SD 57101-3303
(605)330-4400

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief was prepared using Corel WordPerfect 12 and
contains 9,308 words in proportional spacing in 14-pt. type and is therefore in
compliance with Fed. R. App. P. 32(a)(7). I further certify that I have provided to the
Court and to each party separately represented by counsel a CD containing the full
text of the brief. The CDs have been scanned for viruses using Trend Micro
OfficeScan Corporate Edition 6.5 and are virus free.

MARK E. SALTER
Assistant United States Attorney

-40-

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that service of the foregoing brief was made upon the Appellant by mailing by first class mail, postage prepaid, two true and correct copies thereof and one CD containing the brief to Appellant's attorney of record at the post office address as shown, on this 29th day of September, 2006:

Al J. Arendt
Attorney at Law
P.O. Box 1077
Pierre, SD 57501

MARK E. SALTER
Assistant United States Attorney

-41-